UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
AMIN   NAIM   SALIM   ADRIANZA,
*individually   and   as   next   friend   to*
*Leimariana   del   Valle   Petit   Romero*,
LEIMARIANA   DEL   VALLE   PETIT
ROMERO, BLANCA DANELIA FUNES
CASTELLANO, *individually and as next*
*friend to Emma Obando Funes, A.Y.B.O.,*
*and J.L.B.O.*, EMMA OBANDO FUNES,
TEODILA       SAMBULA       RAMOS,
*individually and as next friend to Cinthya*
*Vanessa Castillo Sambula and A.E.C.S.*,                          **MEMORANDUM AND ORDER**
CINTHYA        VANESSA        CASTILLO                                    20-cv-3919 (RPK)
SAMBULA, and JANE DOE,

     Plaintiffs,

    -against-

DONALD   J.   TRUMP,   *in   his   official*
*capacity of the President of the United States*,
CHAD F. WOLF, *in his official capacity as*
*Acting Secretary of Homeland Security*, and
UNITED   STATES   DEPARTMENT   OF
HOMELAND SECURITY,

     Defendants.
-----------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

   In December 2018, the Department of Homeland Security ("DHS") announced the

Migrant Protection Protocols ("MPP").  The MPP states that certain migrants who arrive into the

United States on land without proper documentation may be returned to Mexico for the duration

of their immigration proceedings.  In this action, four sets of migrants and their family members

in New York City sue to have such return orders rescinded.  Plaintiffs contend that they were not

statutorily eligible to be returned to Mexico because they were not "arriving on land" when

apprehended.  *See* 8 U.S.C. § 1225(b)(2)(C). They also contend that federal regulations barred

1

their returns, because they did not cross into the United States at designated ports of entry.   In addition, plaintiffs bring claims under the Administrative Procedures Act ("APA"), Rehabilitation Act, and Due Process Clause of the Fifth Amendment.

Defendants have moved to stay this action until the Supreme Court decides a pending case in which other plaintiffs are challenging the MPP under the APA.  *See Wolf v. Innovation Law Lab*, *cert. granted.*, No. 19-1212 (Oct. 19, 2020).  I stay proceedings regarding the claims that are squarely implicated by *Innovation Law Lab*.  But I decline to stay litigation over plaintiffs' other claims.

Plaintiffs have moved for a preliminary injunction that would permit the migrants to re-enter the United States for the duration of their removal proceedings.  I conclude that plaintiffs are not entitled to a preliminary injunction on their un-stayed claims, because they have not demonstrated that those claims are likely to succeed on the merits.

## BACKGROUND

### A.  Legal Background

When a migrant is apprehended after unlawful entry, he is ordinarily detained for the duration of his removal proceedings in the United States, *see* DHS, *Assessment of the Migrant Protection Protocols (MPP)* at 1 (Oct. 28, 2019) (Dkt. #19-1 Ex. 6) ("MPP Assessment"); 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(B)(ii), 1225(b)(2)(A); *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018), or released on bond or parole into the United States, *see* 8 U.S.C. §§ 1182(d)(5)(A), 1226(a)(2); *Jennings*, 138 S. Ct. at 837.  But immigration officials have long returned some migrants to Canada or Mexico to await proceedings instead.  *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 445 (Jan. 3, 1997).

2

Congress statutorily authorized such returns in 1996 as part of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), which amended the Immigration and Nationality Act ("INA").  *See* IIRIRA, Pub. L. 104-208, § 302, 110 Stat. 3009 (1996).  As relevant here, that statute provides:

> In the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(C).  Soon after, the Immigration and Naturalization Service ("INS") authorized agents to "require any alien who appears inadmissible and who arrives at a land-border port-of entry from Canada or Mexico, to remain in that country while awaiting a removal hearing."  8 C.F.R. § 235.3(d).  That authority was later transferred to DHS.  *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).   The INS issued regulations defining various terms appearing in the INA but did not enact a regulation defining the term "alien . . . who is arriving on land."  *See* 8 C.F.R § 1001.1.

In December 2018, DHS announced the MPP.  *See* DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec. 20, 2018) (Dkt. #14-8 Ex. A) ("MPP Press Release").  To address a "migration crisis along [the] southern border," these protocols declare that certain migrants who arrive by land from Mexico "illegally or without proper documentation . . . may be returned to Mexico . . . for the duration of their . . . removal proceedings."  Kirstjen M. Nielsen, DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Dkt. #14-8 Ex. B.) ("Nielsen Memo").  The protocols apply to migrants who arrive at a port of entry as well as migrants apprehended between ports of entry.  *See* Customs and Border Patrol, *MPP Guiding Principles* (Jan. 28, 2019) (Dkt. #14-8

Ex. D) ("MPP Guiding Principles"); Customs and Border Patrol, *Muster Guiding Principles for Migrant Protection Protocols (MPP)* (Dkt. #14-8 Ex. E) ("Muster Memo").

Alongside the protocols, the Government of Mexico announced that it would "authorize the temporary entrance of certain foreign individuals coming from the United States who . . . have received a notice to appear before an immigration judge."  Nielsen Memo at 2.  These individuals could "remain in [Mexico]," and they "would be able to enter and leave [Mexico] multiple times."  *Id.* at 3.  Further, the Government of Mexico committed to "ensur[ing] that foreigners who have received their notice to appear have all the rights and freedoms recognized" by Mexican law, and declared that these foreigners would "be entitled to equal treatment with no discrimination whatsoever and due respect [would] be paid to their human rights."  *Ibid.*

Under the protocols, agents generally "retain discretion to process aliens for MPP . . . on a case-by-case basis."  MPP Guiding Principles at 1.  But only "aliens arriving from Mexico who are amenable to the process" are to be "transferred to await proceedings in Mexico."  *Ibid.* Aliens who "are not amenable to MPP" include, for example, "[u]naccompanied alien children"; "[c]itizens or nationals of Mexico"; "[a]liens processed for expedited removal"; "[a]ny alien who is more likely than not to face persecution or torture in Mexico"; and "[a]liens in special circumstances," including aliens with "[k]nown physical/mental health issues."  *Ibid.*; *see* Muster Memo at 1.  The protocols direct agents to make determinations about these categories "based on the facts and circumstances presented by a particular case."  Muster Memo at 1.

A migrant who is returned to Mexico may still pursue a claim for asylum in the United States, but he must do so from across the border.  *See* MPP Press Release at 2.  The migrant is issued a notice to appear for immigration proceedings at a port of entry on a later date.  *See* MPP Guiding Principles at 1.  The migrant is transported from the port of entry to the hearing site and

then returned to Mexico after the hearing.  *See id.* at 2.  This continues for as many hearings as necessary to conclude the migrant's removal proceedings.  *See ibid.*

### B.  Factual Background

This lawsuit concerns four sets of migrants who crossed into the United States between ports of entry, requested asylum, and were returned to Mexico to await further immigration proceedings.  Leimariana del Valle Petit Romero fled Venezuela to seek asylum in the United States.  *See* Decl. of Leimariana del Valle Petit Romero ¶¶ 1-4 (Dkt. #14-2) ("Romero Decl.").  She crossed the U.S.-Mexico border on foot in September 2019.  *Id.* ¶ 4.  She was apprehended "several hours" after crossing and then returned to Mexico to await her immigration hearing.  *Id.* ¶¶ 4, 10.   Emma Obando Funes and her children A.Y.B.O. and J.L.B.O fled Honduras to seek asylum here.  *See* Decl. of Emma Obando Funes ¶ 1 (Dkt. #14-3) ("Funes Decl.").  They crossed the Rio Grande river into the United States. in September 2019.  *See id.* ¶¶ 2, 5.  Immigration authorities apprehended them "[s]ome time after" crossing, *id.* ¶ 5, and then returned them to Mexico to await their immigration hearings, *see id.* ¶¶ 9-10.  Cinthya Vanessa Castillo Sambula fled Honduras to seek asylum in the United States.  *See* Decl. of Cinthya Vanessa Castillo Sambula ¶¶ 2-4 (Dkt. #14-4) ("Sambula Decl.").  When she crossed the U.S.-Mexico border in November 2019, she was pregnant with her child A.E.C.S.  *See id.* ¶ 3.  Immigration authorities "later located [her]" and returned her to Mexico to await her immigration hearing.  *Id.* ¶¶ 4, 6.  She gave birth to A.E.C.S. three months later.  *Id.* ¶ 13.  The final migrant, Jane Doe, also fled Honduras.  *See* Decl. of Jane Doe ¶¶ 1-2 (Dkt. #9-2) ("Doe Decl.").  She crossed the Rio Grande river into the United States in October 2019.  *See id.* ¶¶ 3, 5.  She was apprehended after walking "for a long time after that," *id.* ¶ 5, and then she was returned to Mexico to await her immigration hearings, *see id.* ¶ 9.

5

## C.  Procedural History

This lawsuit challenging the migrants' returns was filed on August 25, 2020.  *See* Compl. ¶ 32 (Dkt. #1).  The plaintiffs are (i) Leimariana del Valle Petit Romero, as well as her husband Amin Naim Salim Adrianza, who appears individually and as next friend to Ms. Petit Romero; (ii) Emma Obando Funes, as well as her sister Blanco Danelia Funes Castellano, who appears individually and as next friend to Ms. Obando Funes, A.Y.B.O. and J.L.B.O.; (iii) Cinthya Vanessa Castillo Sambula, as well as Teodila Sambula Ramos, individually and as next friend to Ms. Sambula and A.E.C.S.; and (iv) Jane Doe, who appears without a next-friend representative. *See id*. ¶¶ 7-15.  Mr. Adrianza, Ms. Funes Castellano, and Ms. Sambula Ramos (the "New York plaintiffs") all reside in the Eastern District of New York.  *See id.* ¶¶ 7, 9, 13, 21.

Plaintiffs principally allege that defendants' actions in returning the migrant plaintiffs to Mexico violated the INA and its implementing regulations, the APA, the Rehabilitation Act, and the Fifth Amendment's Due Process Clause.  *See id.* ¶¶ 116-125.

On September 5, 2020, plaintiffs moved for a preliminary injunction "requiring the defendants to rescind the orders returning Ms. Petit Romero, Ms. Obando Funes, A.Y.B.O., J.L.B.O., Ms. Castillo Sambula, A.E.C.S., and Ms. Doe to Mexico and permitting their re-entry into the United States for the duration of their removal proceedings and any appeals."  Pls.' Notice of Mot. at 1 (Dkt. #14).  Alternatively, plaintiffs seek an order directing "the defendants to make an independent determination of whether the plaintiffs in Mexico should be excluded from the Migrant Protection Protocols."  *Ibid.*  In seeking that relief, plaintiffs argue that they are likely to succeed on their claims that plaintiffs' returns (i) violated Section 1225(b)(2)(C) of the INA; (ii) violated 8 C.F.R. §§ 1001.1(q) and 235.3(d); (iii) were arbitrary and capricious in violation of the APA; (iv) ran afoul of the APA's notice-and-comment requirements; and (v) failed to comply with agency procedures, in violation of *United States ex rel. Accardi v.*

6

*Shaughnessy*, 347 U.S. 260 (1954).  Plaintiffs also contend that Ms. Doe and A.Y.B.O. are likely to prevail on claims that their returns violated the Rehabilitation Act, and that Ms. Doe is likely to prevail on a challenge under the Fifth Amendment's Due Process Clause.

During oral argument on plaintiffs' motion, the Supreme Court granted certiorari in a different lawsuit challenging the MPP.  *See Wolf v. Innovation Law Lab*, *cert. granted.*, No. 19-1212 (Oct. 19, 2020).  In that case, the Supreme Court has agreed to review whether the MPP "is exempt from the APA requirements of notice-and-comment rulemaking," among other questions. *See* Pet. at i, *Innovation Law Lab*, No. 19-1212, 2020 WL 1877955 at *i.  The Court has stayed a lower-court injunction against the MPP pending the resolution of *Innovation Law Lab*.  *See Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (mem.) (2020).

After the Supreme Court granted certiorari in *Innovation Law Lab,* defendants move to stay this action until the Supreme Court resolves that case.  Plaintiffs have opposed a stay.

## DISCUSSION

This opinion proceeds in three parts.  First, I address threshold questions of standing and venue.  I conclude that at least some plaintiffs have established standing and that venue is proper.  Second, I stay proceedings on two claims that are intertwined with the issues on which the Supreme Court has granted review in *Innovation Law Lab*.  Specifically, I stay proceedings on plaintiffs' claim that DHS was required to promulgate the MPP using notice-and-comment procedures and their claim that DHS failed to comply with procedures in the MPP guidance documents.  I deny defendants' request to stay consideration of plaintiffs' remaining four arguments.  Finally, I conclude that plaintiffs are not entitled to a preliminary injunction on the claims that have not been stayed, because they have not demonstrated a likelihood of success on the merits of those claims.

7

## I.     Standing and Venue

Before turning to the substance of plaintiffs' motion, I consider whether I have the authority to adjudicate it.

### A.     Standing

Plaintiffs have set out evidence of standing that is adequate to seek a preliminary injunction.  A court has jurisdiction to adjudicate a preliminary injunction motion if there is standing "for each claim and form of relief sought."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d. Cir. 2003)).  If multiple parties seek the same relief, a court ordinarily has jurisdiction so long as one of the plaintiffs has standing.  *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017).  In turn, a plaintiff has standing if she demonstrates an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable to the challenged action"; and (iii) "redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

There is no dispute here that the migrant plaintiffs returned to Mexico under the MPP have standing to seek the relief requested on each claim in the preliminary injunction motion. Their return to the Tamaulipas region of Mexico subjected them to actual, concrete, and particularized harms, which are ongoing.  They are fairly traceable to immigration officials' decisions to return those plaintiffs.  And they would be redressed through the remedy that plaintiffs seek: permission to leave Tamaulipas and re-enter the United States for the duration of their immigration proceedings.

B.       Venue

Plaintiffs have also adequately established venue.  When defendants object to venue, a district court must address venue before it can decide the merits of a motion for a preliminary injunction.  *See Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1134-35 (9th Cir. 2005); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (Friendly, J.) (stating that venue should be addressed "prior to consideration of the merits").  Plaintiffs invoke the venue provision that allows lawsuits against the United States to be brought in a judicial district where any plaintiff resides.  28 U.S.C. § 1391(e)(1) (specifying that action against the United States may be brought in a district in which "the plaintiff resides if no real property is involved in the action"); *see* 14D Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 3815 (4th ed.) ("In cases involving multiple plaintiffs, venue is proper where any one of them resides."); *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 344 (6th Cir. 2005) ("Each court faced with the same issue has interpreted 'the plaintiff' to mean 'any plaintiff.'").  Here, the only plaintiffs who reside in this judicial district are the relatives of the migrant plaintiffs.  Venue accordingly turns on whether at least one of those New York plaintiffs can anchor venue.

Defendants argue that none of the New York plaintiffs can anchor venue because each lack standing under Article III.  But at minimum, Amin Naim Salim Adrianza has adequately established independent standing and, therefore, venue.  *See California v. Trump*, 379 F. Supp. 3d 928, 941 (N.D. Cal. 2019) (concluding that venue was proper under Section 1391(e)(1) even if some plaintiffs lacked standing because California had "independent Article III standing" to bring action in Northern District of California), *aff'd*, 963 F.3d 926 (9th Cir. 2020), *cert. granted sub nom. Trump v. Sierra Club*, No. 20-138, 2020 WL 6121565 (U.S. Oct. 19, 2020).  Mr. Adrianza seeks an injunction that would permit his spouse to enter the country.  In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court held that relatives of individuals excluded

9

from the country under an executive order had standing to challenge the order, because "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact." *Id.* at 2416.  The Court noted that conclusion was consistent with prior decisions on the "merits of claims asserted by United States citizens regarding violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals," *ibid.* (citing *Kerry v. Din,* 576 U.S. 86 (2015) (plurality opinion); *Kleindienst v. Mandel,* 408 U.S. 753, 762 (1972)), as well as with an earlier stay order that "recognized that an American individual who has 'a bona fide relationship with a particular person seeking to enter the country . . . can legitimately claim concrete hardship if that person is excluded,'" *ibid.* (quoting *Trump v. Int'l Refugee Assistance Project,* 137 S. Ct. 2080, 2089 (2017)).

Defendants do not persuasively distinguish that authority.  Defendants emphasize that the migrant plaintiffs will be permanently reunited with their relatives in the United States only if they ultimately prevail on their asylum applications.  *See* Hr'g Tr. 84:19-87:24 (Oct. 16, 2020). But they fail to explain why Mr. Adrianza lacks a concrete interest in being reunited with his wife while her asylum application is being considered—a period that may last for years.  *See id.* at 87:1-2; MPP Assessment at 3, 6.

Nor have defendants convincingly explained why a favorable decision would not bring these spouses together.  Defendants speculate that family reunification could be thwarted if Mr. Adrianza were himself deported.  *See* Hr'g Tr. 86: 10-17 (Oct. 16, 2020).  But Mr. Adrianza is in the United States now, and nothing in the record suggests that he is likely to be removed from the country soon.  As for his wife, Ms. Petit Romero, the government's filings establish that aliens apprehended while unlawfully entering the United States between ports of entry are often

released in the United States pending the determination of their asylum applications because "resource constraints" and "other court-ordered limitations" make "many releases inevitable." MPP Assessment at 1; *see* MPP Press Release at 1. There is therefore "a non-speculative likelihood" that Mr. Adrianza's separation from his wife would be "remedied by the requested relief." *Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013)). In any event, "[t]he Supreme Court has held that a plaintiff has standing where 'the challenged action of the [government] stands as an absolute barrier' that will be removed 'if [the plaintiff] secures the . . . relief it seeks.'" *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). An injunction rescinding the return order would remove the absolute barrier that keeps Mr. Adrianza and Ms. Petit Romero from living together in the United States. Under these circumstances, at minimum, Mr. Adrianza has a present interest in family reunification that is adequate to establish standing.

The defendants argue that even if Mr. Adrianza and the other New York plaintiffs have standing under Article III, they fall outside the "zone of interests" for the provisions on which they rely. But a plaintiff falls outside the zone of interests for a provision only if his "interests are so marginally related to or inconsistent with the purposes implicit in [the provision] that it cannot reasonably be assumed that Congress intended to permit the suit." *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 131-32 (2d Cir. 2020) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). That cannot be said of Mr. Adrianza's claims under Section 1225(b)(2)(C). The Second Circuit has previously determined when assessing the "broader context of the INA" that "goals of family unity" are among the "interests implicated in the

11

statute." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 62-63 (2d Cir. 2020).  Mr. Adrianza's independent standing makes venue proper in this district.

## II.    Motion for Stay

Having found that I have the authority to consider plaintiffs' motion for a preliminary injunction, I next turn to the government's motion for a stay.  I grant the government's motion to stay consideration of two claims that are squarely implicated by the certiorari grant in *Innovation Law Lab* but deny the government's motion to stay plaintiffs' remaining four claims.

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).  In deciding whether to enter a stay, district courts commonly consider "the interests of the courts"; "the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed"; "the private interests of and burden on the defendants"; "the interests of persons not parties to the civil litigation"; and "the public interest." *Id.* at 99 n.13.  But the decision "ultimately requires and must rest upon 'a particularized inquiry into the circumstances of, and the competing interests in, the case.'" *Id.* at 99 (quoting *Banks v. Yokemick*, 144 F. Supp. 2d 272, 275 (S.D.N.Y. 2001).

When balancing those considerations, district courts often stay litigation over questions that mirror or are intertwined with questions that are pending before a higher court.  *See, e.g., Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) ("[A] court may . . . properly exercise its staying power when a higher court is close to settling an important issue of law bearing on the action"); *Carter v. United States*, No. 06-CV-225, 2007 WL 2439500, at *3 (D. Vt. Aug. 23, 2007) ("[I]t is common practice in this Circuit to postpone the final disposition

of a case pending an upcoming decision in the United States Supreme Court."); *Jugmohan v. Zola*, No. 98-CV-1509, 2000 WL 222186, at *5 (S.D.N.Y. Feb. 25, 2000) ("Postponing the final disposition of a case pending an upcoming decision by the United States Supreme Court is a practice exercised by the Second Circuit in the interest of judicial economy."); *see also Gonzalez de Fuente v. Preferred Home Care of New York LLC,* No. 18-CV-6749, 2020 WL 738150, at *2-*4 (E.D.N.Y. Feb. 13, 2020) (granting stay pending Supreme Court decision in parallel case); *In re MPM Silicones, L.L.C.*, No. 15-CV-2280, 2017 WL 4386378, at *2 (S.D.N.Y. Oct. 2, 2017) (granting stay pending Second Circuit decision in similar case).

Under these principles, a stay is warranted on two of plaintiffs' claims.  First, litigation is stayed over plaintiffs' claim that the MPP is a substantive rule requiring notice-and-comment procedures.  The Supreme Court has agreed to consider essentially the same question, by granting review of whether the "MPP is exempt from the APA requirement of notice-and-comment rulemaking" in *Innovation Law Lab*.  *See* Pet. at i, *Innovation Law Lab*, No. 19-1212, 2020 WL 1877955 at *i.  Plaintiffs note that *Innovation Law Lab* raises that question in the context of a challenge to the MPP's non-refoulement procedures, while plaintiffs here are focused on the portion of the MPP that sets out eligibility criteria.  *See* Pls.' Stay Letter at 2 (Oct. 21, 2020) (Dkt. #25).  But defendants' argument in *Innovation Law Lab* is not limited to a portion of the MPP.  Rather, defendants argue that the MPP "qualifies as a 'general statement[] of policy' that is exempt from the APA's notice-and-comment requirement," because it "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *See* Pet. at 29, *Innovation Law Lab*, No. 19-1212, 2020 WL 1877955 at *29 (alterations in original).  At minimum, the disposition of the claim in *Innovation Law Lab* would shed significant light on the notice-and-comment challenge here.  *See Sikhs for Justice*,

893 F. Supp. 2d at 622 (noting that a court may "properly exercise its staying power" to await a high court decision "bearing on the action," even when 'the issues in [a higher court's] proceedings are [not] necessarily controlling on the action" in the lower court and "may not settle every question of fact and law"); *Gonzalez de Fuente*, 2020 WL 738150 at *3 (same); *In re Literary Works in Elec. Databases Copyright Litig.*, No. 00-CV-6049, 2001 WL 204212, at *3 (S.D.N.Y. Mar. 1, 2001) (same).  Under these circumstances, a stay will appropriately allocate resources and promote legal clarity.  *See Trikona Advisors Ltd. v. Kai-Lin Chuang*, No. 12-CV-3886, 2013 WL 1182960, at *1 (E.D.N.Y. Mar. 20, 2013) (noting the "strong public interest in avoiding time-consuming and unnecessary duplicative litigation"); *see also* Defs.' Stay Letter (Oct. 21, 2020) (Dkt. #24) (noting defendants' interest in avoiding the "need to defend . . . once now, and once again after the resolution of *Innovation*").

The interests in appropriately allocating resources, avoiding duplicative litigation, and promoting legal clarity also justify staying litigation over plaintiffs' claim that defendants violated *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  Plaintiffs' *Accardi* claim is that agency officials impermissibly deviated from procedures set out in agency guidance regarding migrant returns.  *See* Compl. at ¶¶ 57, 75, 89-90; Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj. at 16-19 (Dkt. #14-1) ("Pls.' Mem.").  But an *Accardi* claim is viable only if an agency "denie[d] [it]self the right to sidestep" the procedures on which the claim rests.  *Accardi*, 347 U.S. at 267; *see Mantena v. Johnson*, 809 F.3d 721, 729-30 (2d Cir. 2015).

The Supreme Court's decision on whether the MPP is a substantive rule requiring notice-and-comment procedures, or is instead a "general statement[] of policy," *see* 5 U.S.C. § 553, will inform the *Accardi* determination. That is because "[t]he primary distinction between a substantive rule . . . and a general statement of policy . . . turns on whether an agency intends to

14

bind itself to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *see Gonnella v. United States Sec. & Exch. Comm'n*, 954 F.3d 536, 547 (2d Cir. 2020) (finding directive to be "policy statement" rather than "legislative rule" in part because it was "highly discretionary, non-binding, and d[id] not impose any legal requirements"); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019) ("The critical question in distinguishing between legislative rules and general statements of policy is whether the statement 'is of present binding effect.'"); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) ("The primary distinction between a substantive rule . . . and a general statement of policy . . . turns on whether an agency intends to bind *itself* to a particular legal position."). Because "[i]t is axiomatic that an agency . . . need not adhere to mere 'general statement[s] of policy,'" *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.), *Innovation Law Lab* may well settle plaintiffs' *Accardi* claim.

In deciding to stay proceedings on these two claims, I have considered plaintiffs' countervailing interest in avoiding delay. That interest should not be minimized, particularly when plaintiffs have argued that they will suffer irreparable harm in the absence of injunctive relief. But the duration of a stay will be limited, because the Supreme Court will almost certainly decide *Innovation Law Lab* in the current Term. And I take into account that plaintiffs waited for a considerable period before challenging their returns to Mexico. Although plaintiffs were returned to Mexico in late 2019, *see* Romero Decl. ¶ 4; Funes Decl. ¶¶ 2, 5; Sambula Decl. ¶ 3; Doe Decl. ¶¶ 3, 5, they filed this lawsuit only in late August 2020, *see* Compl. ¶ 32, and first sought a preliminary injunction in early September 2020, *see* Pls.' Notice of Mot. at 1. On balance, under these circumstances, I find appropriate the "common practice in this Circuit [of]

postpon[ing] the final disposition" of questions closely related to those on which certiorari has been granted, *Carter*, 2007 WL 2439500, at *3.

That approach is comparable to the one that the Supreme Court and D.C. Circuit have taken in addressing related MPP challenges. The plaintiffs in *Innovation Law Lab* also asserted they would face irreparable harm if forced to await adjudication of their asylum claims in Mexico, and the district court there awarded a preliminary injunction on those grounds. *See Innovation Law Lab v. Nielsen*, 366 F. Supp. 3d 1110, 1130 (N.D. Cal. 2019), *aff'd sub. nom. Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *cert. granted*, No. 19-1212, 2020 WL 6121563 (U.S. Oct. 19, 2020). But the Supreme Court nevertheless issued a stay, deciding that any injunctive relief in that case should await the Court's decision on the merits. *See Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (mem.) (2020). Plaintiffs suggest that "the equities and merits of *Innovation* are materially different" because the injunction that the Supreme Court stayed had "immediately halted all operation of the MPP within the Ninth Circuit," whereas plaintiffs here seek injunctive relief only as to themselves. *See* Pls.' Stay Letter at 3. But that case is not so readily distinguished. The defendants in *Innovation Law Lab* asked the Court to either stay the Ninth Circuit's broad injunction or, in the alternative, to stay those portions that afforded relief to individuals other than the plaintiffs. *See* Gov't's Appl. for a Stay, No. 19A960, at 38, 40, *Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (mem.) (2020). The Court chose to stay the injunction in its entirety. Similarly, after the grant of certiorari in *Innovation Law Lab*, the D.C. Circuit stayed an appeal from the denial of a motion for a preliminary injunction because the lawsuit included claims paralleling some of those in *Innovation Law Lab*—even though the plaintiff had alleged he would suffer irreparable harm if required to await the completion of his

immigration proceedings in Mexico.  *See Cruz v. U.S. Dep't of Homeland Sec.*, No. 19-5359 (D.C. Cir. Oct. 20, 2020) (per curiam).

I decline the government's invitation to stay adjudication of plaintiffs' remaining claims. *Innovation Law Lab* is not likely to significantly inform the disposition of plaintiffs' remaining arguments.  And while there would be some efficiency benefits to having all of plaintiffs' claim litigated on the same calendar, plaintiffs' countervailing interest in speedy disposition of their remaining claims outweighs that interest.  I therefore turn to whether plaintiffs' remaining arguments entitle them to a preliminary injunction.

## III.    Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy."  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted).  Such injunctions are "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).   To obtain such an injunction, as a general matter, a litigant must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest.  *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter*, 555 U.S. at 20); *see Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019) (citing *Winter*, 555 U.S. at 20).[1]  As explained below, I conclude that the plaintiffs have not demonstrated the requisite

---

[1]      An even stronger showing on the merits is generally needed when a litigant seeks a "mandatory" injunction to command some positive act that will alter the status quo.  *See D.D. ex rel. V.D. v. N.Y.C. Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018).  In such cases, the movant must demonstrate a "clear or substantial likelihood of success on merits."  *N. Am. Soccer League,* 883 F.3d at 37 (citations omitted).  The parties dispute whether the injunction that plaintiffs seek would "alter" the status quo or merely "restore" it.  I need not resolve that dispute, because the plaintiffs' claims are not likely to succeed even under the more permissive standard.

likelihood of success on the merits of their un-stayed claims.  I therefore do not determine whether they have made the other showings needed to obtain a preliminary injunction.

> **A.      Plaintiffs have not demonstrated a likelihood of success on their argument that immigration officials violated 8 U.S.C. § 1225(b)(2)(C) by returning them to Mexico.**

Plaintiffs first argue that immigration authorities lacked the power under 8 U.S.C. § 1225(b)(2)(C) to return them to Mexico while they were awaiting removal proceedings.  *See* Pls.' Mem. at 11.  Section 1225(b)(2)(C) authorizes only the return of "an alien . . . *who is arriving on land* (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States."  8 U.S.C. § 1225(b)(2)(C) (emphasis added).

Plaintiffs' argument turns on the definition of "arriving" in Section 1225(b)(2)(C). To arrive is to "come to the end of a journey."  1 *Oxford English Dictionary* 651 (2d ed. 1989); *see Webster's Third New International Dictionary* 121 (2002) ("to reach a destination; come to the end of a journey").  Congress's "use of the present progressive tense 'arriving,' rather than the past tense 'arrived,' implies [a] geographic or temporal limit."  *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020).  But that present progressive formulation—"is arriving on land," 8 U.S.C. § 1225(b)(2)(C)—also suggests "'an ongoing process,'" rather than an instantaneous event, *M-D-C-V-*, 28 I. & N. Dec. at 22 (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020)).  Taking the term and tense together, I conclude that aliens are not "arriving on land" only at the moment of crossing the border—a conclusion that plaintiffs appear to accept. *See* Hr'g Tr. 9:11-21 (Oct. 16, 2020) (stating that plaintiffs are "not contesting" that an alien apprehended "20 yards from the border . . . could still be considered arriving").  Migrants are not naturally said to have "come to the end of [their] journey" as they continue making an arduous journey on foot through a border zone.  Instead, aliens who have recently crossed the boundary line and are walking toward the interior of the country are still in the process of "arriving on

land" from a foreign territory.  *Cf. Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'").

Applying that understanding to the limited record before me, I cannot conclude that plaintiffs have shown a likelihood of success on their claim that they were not "arriving on land" when apprehended.  Plaintiff Leimariana del Valle Petit Romero states that she was apprehended after crossing the U.S.-Mexico border and "walk[ing] for several hours."  *See* Romero Decl. ¶ 4. Plaintiff Emma Obando Funes says only that she and her sons walked across the U.S.-Mexico border and were apprehended "[s]ome time after that."  *See* Funes Decl. ¶ 5.  Plaintiff Cinthya Vanessa Castillo Sambula simply states that she crossed the U.S.-Mexico border and was "later" apprehended by immigration officials.  *See* Sambula Decl. ¶ 4.  And plaintiff Jane Doe declares only that she "walked for a long time" after she crossed into the United States.  *See* Doe Decl. ¶ 5.  I cannot conclude from these limited declarations that plaintiffs are likely to show that they were not "arriving on land" from a contiguous foreign territory when apprehended.

In their reply brief and at oral argument, plaintiffs seek to shift focus from their own apprehensions toward the outer bounds of those permitted under the MPP.  They argue that aliens are no longer "arriving" 96 hours after they cross the border—the outer bound suggested by the Muster memo.  *See* Pls.' Reply Mem. of Law in Supp. of Their Mot. for Prelim. Inj. at 7-8 (Dkt. #23) ("Pls.' Reply Mem."); Hr'g Tr. 4:23-25 (Oct. 16, 2020).  Of course, litigants cannot generally challenge the application of a statute to themselves on the basis that the statute cannot properly be applied to someone else.  To avoid that problem, plaintiffs in reply and at oral argument seek to restyle their Section 1225(b)(2)(C) argument as a claim under the APA that

their own removals are prohibited as the product of an invalid 96-hour agency rule.  *See* Pls.'
Reply Mem. at 7-8; Hr'g Tr. 5:16-6:22 (Oct. 16, 2020); Hr'g Tr. 11:4-20 (Oct. 19, 2020).

    That restyling is not properly before me.  In their motion for a preliminary injunction,
plaintiffs' argument concerning the "arriving on land" portion of Section 1225(b)(2)(C) was that
they themselves could not be described as "arriving on land" under that provision.  *See* Pls.'
Mem. at 10-12.   They stated, for example, that that their motion "presents [the]
question . . . whether the MPP can be applied to these plaintiffs, who were not apprehended
while 'arriving' in the United States, but after they had entered." *Id.* at 11 n.4.  They did not
invoke any purported 96-hour rule, and their sole reference to the APA as part of their "arriving"
argument was in contending that "[a]pplying Section 1225(b)(2)(C) to the MPP Plaintiffs, who
were apprehended after entering the United States, violates the INA, and therefore, the APA."
*Id.* at 12.  Plaintiffs cannot recast their statutory claim as an APA challenge to a purported
96-hour rule in a reply brief, more than halfway through the preliminary injunction litigation.
*See, e.g.*, *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 118 n.15 (S.D.N.Y. 2020)
(citing *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)); *Zirogiannis v. Seterus, Inc.*,
221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (citation omitted).

    Further, I would be unlikely to conclude that plaintiffs could demonstrate a substantial
likelihood of success on that argument.  MPP guidance documents do not mandate the return of
aliens apprehended within 96 hours of crossing the border.   Instead, the actual decisions to
return these plaintiffs to Mexico under Section 1225(b)(2)(C) appear to rest on individual
determinations.  The "guiding principles" for the program emphasize that the determination
whether to return a particular alien to Mexico under Section 1225(b)(2)(C) turns on  "an exercise
of discretion" by immigration officers, who are to determine whether individuals should be

returned to Mexico "on a case-by-case basis." *See* MPP Guiding Principles at 1; *see also* Muster Memo at 1 (explaining that MPP return procedures may be applied only to an alien "who in an exercise of discretion the [immigration] agent determines should be subject to the process"). The Muster memo on which plaintiffs rely indicates that immigration officials must make individual judgments about whether aliens qualify as "arriving on land," rather than applying a hard-and-fast 96-hour rule. *See* Muster Memo at 1 ("*In general, and on an individualized basis*, USBP agents *may* consider an alien to be arriving on land for purposes of the MPP if the alien is encountered within 96 hours of the alien's crossing the land border") (emphasis added). Indeed, that guidance indicates that not every alien apprehended within 96 hours of crossing the border should be treated as "arriving on land." *See id.* at 1 n.2 (stating that while "approximately 90% of aliens apprehended by the U.S. Border Patrol along the southwest border have been apprehended within 96 hours of crossing the land border," agents "should consider unique circumstances in which an alien apprehended in that period has credibly demonstrated that he or she has reached his intended destination in the United States"). Under these circumstances, it is enough to assess whether plaintiffs' individual determinations were proper. *Cf. M-D-C-V-*, 28 I. & N. Dec. at 23 (upholding application of the MPP to a particular alien, after determining that the Board "need only decide in this case whether the respondent, who was apprehended just inside the border upon crossing into the United States" was "properly considered to be 'arriving'").

Even if plaintiffs could challenge their own removal by attacking the Muster memo's 96-hour reference, I would be hard-pressed to conclude that the memo impermissibly construes the term "arriving on land" by indicating that some aliens may be returned if apprehended within 96 hours of entry. Plaintiffs do not dispute that "arriving on land" from a contiguous territory is

a process that extends beyond the moment in which an alien crosses a boundary line.  *See* Hr'g Tr. 9:11-21 (Oct. 16, 2020).  Once that point is recognized, determining the duration of that process requires line-drawing.  Plaintiffs have offered no temporal or geographic line of their own.  Nor do they offer specific linguistic or practical arguments to challenge a 96-hour construction, such as an argument that no migrant could take 96 hours to end his journey from the border into the interior.  And the Muster memo's 96-hour line is tempered by the memo's indication that not all aliens apprehended within 96 hours are subject to return.  Instead, the memo directs that agents deciding whether to return an alien apprehended within 96 hours of entry must consider whether "an alien apprehended in that period has credibly demonstrated that he or she has reached his intended destination in the United States."  *See* Muster Memo at 1 n.2.  Under these circumstances, were plaintiffs' APA argument properly presented and the MPP more categorical, I would be unlikely to conclude at the preliminary injunction stage that plaintiffs have established a substantial likelihood that they will show their returns to be invalid on the grounds that a 96-hour line is impermissible.

> **B.**     **Plaintiffs have not demonstrated a likelihood of success on their argument that their returns violated federal regulations.**

Plaintiffs next challenge their returns on the ground that they did not cross into the United States at designated ports of arrival.  Yet Section 1225(b)(2)(C) itself expressly permits immigration officers to return arriving aliens who do not come through such ports.  It specifies, after all, that the return authority extends to covered aliens "arriving on land (*whether or not at a designated port of arrival*) from a foreign territory contiguous to the United States."  8 U.S.C. § 1225(b)(2)(C) (emphasis added).  Plaintiffs nevertheless contend that a pair of regulations forbid the return of aliens who do not arrive at designated ports.  Plaintiffs have not demonstrated a likelihood of success on these arguments.  Accordingly, they have also failed to

show that the agency acted arbitrarily and capriciously by departing from the agency's own regulations.

### 1.      8 C.F.R. § 1001.1(q)

Plaintiffs contend that their returns are prohibited by 8 C.F.R. § 1001.1(q).  That provision defines "[t]he term arriving alien" to mean only certain aliens who are (i) "coming or attempting to come into the United States at a port-of-entry," (ii) "seeking transit through the United States at a port-of-entry," or (iii) apprehended on water.  *See* 8 C.F.R. § 1001.1(q).  Plaintiffs do not qualify as "arriving aliens" under this definition, because they were apprehended on land outside of the designated ports-of-entry.

The problem for plaintiffs is that while "arriving alien" appears in various places in the INA, it is not used in Section 1225(b)(2)(C).  Instead, Section 1225(b)(2)(C) authorizes the return of an "alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival)."  8 U.S.C. § 1225(b)(2)(C).  It is implausible that the definition of "arriving alien" in 8 C.F.R. § 1001.1(q) was meant to define this different phrase in the statutory return provision, because the phrase there is surrounded by statutory text that conflicts with the regulatory language.  As noted above, the statute reaches certain aliens arriving on land "whether or not at a designated port of arrival."  8 U.S.C. § 1225(b)(2)(C).  But plaintiffs would read the regulation to effectively negate that statutory language, by defining an "alien . . . who is arriving on land" to include only aliens who "present[] at a port-of-entry."  *See* Pls. Mem. at 13.

Plaintiffs' application of 8 C.F.R. § 1001.1(q) to the statutory provision at issue here is also implausible because the regulatory definition of "arriving alien" is much broader than the statutory text.  While Section 1225(b)(2)(C) limits return authority to certain aliens "arriving on land," plaintiffs would import into the statute a definition of "arriving alien" that expressly includes aliens apprehended on water.  *See* 8 U.S.C. § 1001.1(q) (defining "arriving alien" to

include "an alien interdicted in international or United States waters and brought into the United States by any means"). These conflicts are strong evidence that the definition of "[t]he term arriving alien" contained at 8 C.F.R. § 1001.1(q) was not meant to be cross-applied to the separate phrase "alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival)" in Section 1225(b)(2)(C). *See, e.g.*, *Joaquin-Porras v. Gonzalez*, 435 F.3d 172, 179 (2d Cir. 2006) (indicating that immigration regulation should be read in the context of underlying statutes); *cf. Singh v. Mukasey*, 536 F.3d 149, 154 (2d Cir. 2008). Plaintiffs therefore appear unlikely to succeed on their argument from 8 C.F.R. § 1001.1(q).

Plaintiffs suggest that this understanding is undermined by "regulatory history" in which "the agency expressly rejected a proposal to define" the term arriving alien "to include individuals who crossed between ports of entry." *See* Pls.' Reply Mem. at 11; Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. at 10312-13 (Mar. 6, 1997). That history is unilluminating. The agency's choice not to give "arriving alien" a broader scope does not suggest that the agency meant its definition of "arriving alien" to cover the different terms used in Section 1225(b)(2)(C). Nor does such evidence solve the fundamental problem with plaintiffs' construction: that on plaintiffs' interpretation, 8 C.F.R. 1001.1(q) construes language in Section 1225(b)(2)(C) in a manner fundamentally incompatible with other portions of the statutory text.

My conclusion regarding the best reading of 8 C.F.R. § 1001.1(q) parallels the agency's most recent interpretation of its regulation. *See M-D-C-V-*, 28 I. & N. Dec. at 24 & n.9 (concluding that the definition of "arriving alien" in Section 1001.1(q) does not define the terms in Section 1225(b)(2)(C)). In *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), the Supreme Court

24

affirmed that judicial deference is appropriate "to agencies' reasonable readings of genuinely ambiguous regulations." *Id.* at 2408. *Kisor* makes clear, however, that "the possibility of deference can arise only if a regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation." *Id.* at 2414. Because I conclude that the statutory context renders plaintiffs' interpretation of the regulation here implausible, I do not rely on deference principles in concluding that plaintiffs have failed to show a likelihood of success on their argument under 8 C.F.R. § 1001.1(q).

### 2.      8 C.F.R. § 235.3(d)

Plaintiffs next invoke 8 C.F.R. § 235.3(d). That regulation provides:

> The [Immigration and Naturalization] Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, *the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing*. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

8 C.F.R. § 235.3(d) (emphasis added). Plaintiffs argue that by stating that the Service *may* return aliens who arrive "at a land border port-of-entry from Canada or Mexico," the regulation implicitly provides that immigration officials *may not* return aliens who do not pass through those land border ports-of-entry. *See* Pls.' Reply Mem. at 10.

Plaintiffs have not demonstrated they are likely to prevail on this argument. By its terms, the regulation in question is "permissive, not proscriptive." *M-D-C-V-*, 28 I. & N. Dec. at 25. A permissive statement can sometimes prohibit acts it does not mention, by negative implication. But whether such an implication should be drawn "depends on context." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). A court will "not read the enumeration of one case to exclude another unless it is fair

to suppose that" the enacting body "considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003); *see Bloom v. Azar*, 976 F.3d 157, 161 (2d Cir. 2020); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("Virtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context.").

Context does not favor drawing a negative implication from the permissive text of Section 235.3(d). First, the regulation is not freestanding: It implements a statute that confers return authority outside of ports of entry, using the clearest possible terms. I hesitate to infer that a regulation that does not speak directly to returns outside of ports-of-entry implicitly forbids a practice that the underlying statute so expressly authorizes.

Second, the historical backdrop suggests that Section 235.3(d) was designed to approve an existing practice, not to foreclose a new one. Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), immigration officials had asserted the power to return aliens "only . . . at land border ports." *Matter of Sanchez,* 21 I. & N. Dec. 444, 463 (B.I.A. 1996). By enacting Section 1225(b)(2)(C) as part of the IIRIRA, Congress not only sanctioned that practice but also provided discretion to return aliens who arrive on land outside ports-of-entry. *See* 8 U.S.C. § 1225(b)(2)(C). But Congress did not *require* immigration authorities to use that discretion, and the parties appear to agree that after IIRIRA's enactment, immigration officials simply continued their prior practice of returning some aliens apprehended at ports of entry. *See* Hr'g Tr. 19:20-22 (Oct. 16, 2020) (plaintiffs); *id.* at 58:19-25 (defendants). Neither party has pointed to evidence that immigration authorities in that period contemplated exercising their discretion elsewhere. Under these circumstances, I cannot infer that the agency

26

was "consider[ing]" removals beyond ports of entry "and meant to say no to [them]" when it enacted Section 235.3(d). *Barnhart*, 537 U.S. at 168. The agency appears to have simply spoken to the type of returns that were relevant to its activities at the time, without opining on a return-authority issue that had not come up in either pre- or post-IIRIRA practice. On balance, given this statutory context, plaintiffs are unlikely to prevail on their argument that Section 235.3(d) prohibits a class of statutorily authorized removals that the regulation does not discuss.

In arguing to the contrary, plaintiffs place heavy reliance on a three-sentence abstract on DHS's regulatory agenda dating to spring 2017. The abstract indicates that DHS officials took the view that the MPP would require amending Section 235.3(d)—before evidently reconsidering and adopting the MPP without such changes. *See* Off. of Info. and Reg. Affs., *DHS/USCBP Return to Territory*, RIN 1651-AB13 (Spring 2017) (Dkt. #14-8 Ex. G) (stating that the agency intends "to ensure that aliens describe in Section 235(b)(2)(C) of the Immigration and National[ity] Act are returned to the territory from which they came pending a formal removal proceeding" and will "amend 8 C.F.R. 235.3(d) so that it is consistent with this requirement"). That statement deserves little, if any, weight in interpreting 8 C.F.R. § 235.3(d). Decisions of the Board of Immigration Appeals, rather than abstracts like these, are the agency constructions that generally receive high levels of judicial solicitude—including deference in the case of genuine ambiguity concerning the regulation's meaning. *See, e.g., Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2d Cir. 2008) (discussing BIA constructions of regulations); *Yuen Jin v. Mukasey*, 538 F.3d 143, 150 (2d Cir. 2008) (same); *see also Kisor*, 139 S. Ct. at 2414-18 (explaining circumstances in which agencies' interpretations of their regulations may receive judicial deference). Here, the Board of Immigration Appeals has rejected plaintiffs' reading of Section 235.3(d) in a published decision—concluding, in line with the analysis above, that

Section 235.3(d) does not limit the agency's authority to return aliens apprehended outside ports-of-entry. *See M-D-C-V-*, 28 I. & N. Dec. at 25-27.  That decision contains detailed analysis of the text of the statute and regulation, as well as the agency's past practices, *ibid.*, while the abstract on which plaintiffs rely contains none of those things.

Plaintiffs suggest that the withdrawn regulatory-agenda item nevertheless deserves weight because it evidences the agency's longstanding construction of 8 C.F.R. § 235.3(d).  *See* Pls.' Reply Mem. at 10.  The record does not support that conclusion.  The abstract dates only to 2017.  *See DHS/USCBP Return to Territory*, RIN 1651-AB13 (Spring 2017).  And it does not indicate that it reflects a longstanding view or is derived from historical practice.  *See ibid.* Plaintiffs place weight on the fact that in the years after the adoption of 8 C.F.R. § 235.3(d), as in the years before, immigration officials only exercised return authority at ports of entry.  But as explained above, that history is entirely compatible with the defendants' understanding of the regulations, under which the agency had broad return power but limited its use as an exercise of discretion.  *See* pp. 26-27, *supra.*  Plaintiffs have not shown a likelihood of success on their argument that 8 C.F.R. § 235.3(d), which nowhere mentions returns of aliens apprehended outside ports of entry, bars immigration officials from exercising the discretion to conduct such returns that the statute expressly confers.

### 3.    APA Violation Based on Regulatory Departure

The deficiencies in plaintiffs' regulatory arguments mean that plaintiffs have also not demonstrated a likelihood of success on their claim that defendants have acted arbitrarily and capriciously by "depart[ing] from their regulations without a reasoned explanation."  *See* Pls.' Mem. at 9.  The only "departure" from regulations alleged in the briefs is the agency's "disregard" of the purported "port-of-entry limitation."  *See id.* at 14.  But as explained above, DHS regulations do not impose a port-of-entry limitation.  There was therefore no departure, and

thus no "[u]nexplained inconsistency" in agency policy.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

### C.    A.Y.B.O. and Ms. Doe have not demonstrated a likelihood of success on their argument that their returns violated the Rehabilitation Act.

Ms. Doe and A.Y.B.O. have failed to show a likelihood of success on their Rehabilitation Act claims.  Plaintiffs' complaint includes a standalone claim that "defendants' actions violate the Rehabilitation Act and its implementing regulations."  *See* Compl. ¶ 125.  Plaintiffs sought a preliminary injunction on the grounds that this claim was likely to succeed.  Their theory was that "defendants violated the Rehabilitation Act" under 29 U.S.C. § 794(a) because two plaintiffs—A.Y.B.O. and Ms. Doe—now lack meaningful access to a federal program solely by reason of their disabilities.  *See* Pls.' Mem. at 21-23.  They sought a court order "exempting A.Y.B.O. and Ms. Doe from placement in the MPP," *id.* at 22, or directing "defendants to make an independent determination of whether the plaintiffs in Mexico should be excluded from the Migrant Protection Protocols under . . . the Rehabilitation Act," Pls.' Notice of Mot. at 1.

Plaintiffs have not shown a likelihood of success on that standalone Rehabilitation Act claim because they have abandoned it.  After the government argued that the Rehabilitation Act lacks an express or implied private cause of action, *see* Defs.' Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. at 30-33 (Dkt. #18) ("Defs.' Mem."), plaintiffs conceded that point.  They responded only that it is not "of consequence that the Act does not provide a private right of action" because agency action that violates the Rehabilitation Act would be arbitrary and capricious under the APA.  Pls.' Reply Mem. at 14.  Similarly, plaintiffs took no issue with the statement at oral argument that was now "undisputed . . . that the Rehabilitation Act itself doesn't provide a cause of action."  *Compare* Hr'g Tr. 77:14-18 (Oct. 16, 2020) (court's

statement that "plaintiffs can correct me if I'm wrong" in that understanding), *with* Hr'g Tr. 15:4-16:3 (Oct. 19, 2020) (plaintiffs' closing remarks that do not dispute that understanding).

Plaintiffs have belatedly suggested that the APA supplies the private right of action that they concede the Rehabilitation Act does not.  In reply and at oral argument, they argued that their Rehabilitation Act claim could be framed as a claim that immigration officials violated the APA because they did not comply with the Rehabilitation Act.  And they argued that the APA provides an express private right of action to bring that claim.  *See* Pls.' Reply Mem. at 14; Hr'g Tr. 15:7-22, 16:13-21 (Oct. 19, 2020).  But these arguments come too late to support the current motion for a preliminary injunction.  *See Zirogiannis*, 221 F. Supp. 3d at 298 (declining to consider "[n]ew arguments first raised in reply papers in support of a motion").  The complaint treated the Rehabilitation Act claim as distinct from the APA claims raised in later counts.  *See* Compl. ¶ 125.  It did not give the government "fair notice" that plaintiffs were pursuing a theory that immigration officials violated the APA by virtue of Rehabilitation Act failings.  *Cf. Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (explaining that a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").  Nor did plaintiffs' memorandum in support of their preliminary injunction motion contain any suggestion that plaintiffs were relying on the APA to provide a vehicle for their Rehabilitation Act claims.  *See* Pls.' Mem. at 19-22.  Indeed, plaintiffs' Rehabilitation Act argument does not even mention the APA.  *Ibid.*  Accordingly, defendants' briefing was premised on the understanding that plaintiffs brought only a standalone claim.

Addressing plaintiffs' belatedly raised APA reframing on the present record would be unwise.  There has been no adversarial briefing on whether the APA provides a vehicle for plaintiffs to pursue their Rehabilitation Act challenge.  Moreover, the contours of plaintiffs' APA

theory are imprecise.  For instance, plaintiffs have not identified the final agency action they seek to have reviewed.  And because the Rehabilitation Act concerns exclusion from government programs based on a disability, *see* 29 U.S.C. § 794(a), as well as the assurance of meaningful access to government programs, *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003), it is not immediately clear that the relevant agency action would be the return of plaintiffs to Mexico.  Under these circumstances, I decline to address, as part of plaintiffs' motion for a preliminary injunction, plaintiffs' belated suggestion that the APA provides a cause of action for their Rehabilitation Act claim.

      **D.**      **Ms. Doe has not demonstrated a likelihood of success on her argument that her return violated her substantive due process rights.**

Lastly, Ms. Doe is not likely to succeed on her argument that immigration officials violated substantive due process guarantees by returning her to Mexico on the ground that doing so exposed her to dangerous conditions.  *See* Pls.' Mem. at 22-24.  In *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), the Supreme Court held that the Fifth Amendment's Due Process Clause does not generally require the government to protect life, liberty, or property "against invasion by private actors."  *Id.* at 195.  Nevertheless, courts of appeals have "recognized two exceptions to this general principle, rooted in the Supreme Court's analysis in *DeShaney*," under what is often called the "state-created danger" doctrine.  *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008).  First, in some circumstances, the Due Process Clause obligates state actors to protect a person with whom they have a "special relationship."  *Ibid.*  Second, in some circumstances, state actors have an obligation to protect a person if they have "assisted in creating or increasing the danger to" that person.  *Ibid.*

Ms. Doe is unlikely to prevail under these principles, assuming I have jurisdiction over the substantive due process claim she presents.  *See* Defs.' Mem. at 23-25 (arguing that 8 U.S.C.

§ 1252(a)(2)(B)(ii) bars jurisdiction over Ms. Doe's substantive due process claim); *Butcher v. Wendt*, 975 F.3d 236, 242-244 (2d Cir. 2020) (permitting court to assume "hypothetical jurisdiction" to resolve a straightforward merits question when a complex jurisdictional dispute was "statutory in nature"); *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 123 (2d Cir. 2020) (assuming hypothetical jurisdiction when the question whether a provision presented a jurisdictional bar was "complex" and a "claim fail[ed] on other more obvious grounds").

First, whatever constitutional protections the state-created danger doctrine confers in domestic settings, the weight of circuit authority holds that "an alien has no constitutional substantive due process right not to be removed from the United States, nor a right not to be removed from the United States to a particular place."  *Enwonwu v. Gonzales*, 438 F.3d 22, 29 (1st Cir. 2006); *Beibei Zhang v. Holder*, 358 Fed. App'x 216, 218 (2d Cir. 2009) ("[T]he state-created danger doctrine does not apply in immigration proceedings."); *Kamara v. Att'y Gen.*, 420 F.3d 202, 217 (3d Cir. 2005) ("[T]he state-created danger exception has no place in our immigration jurisprudence."); *Vincente-Elias v. Mukasey*, 532 F.3d 1086, 1095 (10th Cir. 2008) (refusing to "judicially engraft a new form of relief from removal"); *but see Wang v. Reno*, 81 F.3d 808, 818-19 (9th Cir. 1996) (affirming injunction against deportation because government had a constitutional duty to protect testifying witness against torture and possible execution). Those holdings reflect separation-of-powers limitations, including the principle that "the Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit." *Thuraissigiam*, 140 S. Ct. at 1982 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)); *see Enwonwu*, 438 F.3d at 30 (explaining that the application of state-created danger doctrine to  removals would impermissibly "shift to the judiciary the power to expel or retain aliens" that "the Constitution has assigned to the political branches").  That

authority forecloses Ms. Doe's substantive due process claim here.  *Cf. Nora v. Wolf*, No. 20-CV-0993, 2020 WL 3469670, at *13 (D.D.C. June 25, 2020) (concluding that plaintiffs' constitutional challenge to the MPP was unlikely to succeed for the same reasons).

Second, even if the state-created danger doctrine were available in the immigration context, Ms. Doe has not demonstrated that she could prevail under it.  In contexts in which the state-created danger doctrine applies, it proscribes only conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Matican.* 524 F.3d at 155 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).  That standard "screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to . . . a font of tort law.'"  *Ibid.* (citation omitted).

Ms. Doe is not likely to clear that high bar.  Conduct does not generally shock the conscience when government officials are "subject[] to the pull of competing obligations," *Lombardi v. Whitman*, 485 F.3d 73, 85 (2d Cir. 2007) (quoting *Lewis*, 523 U.S. at 846); *see Robischung Walsh v. Nassau Cnty. Police Dep't*, 421 F. App'x 38, 41 (2d Cir. 2011), as are the immigration officers who must assess whether individual migrants are amenable to return to Mexico under the MPP.  Moreover, to show conscience-shocking conduct, a plaintiff must demonstrate more than mere negligence on the part of the defendants.  *See Lewis*, 523 U.S. at 849.  She must show that they were at least deliberately indifferent, *see id.* at 850, to an "obvious risk of severe consequences and extreme danger," *Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005); *see Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009); *cf. Charles v. Orange County.*, 925 F.3d 73, 87 (2d Cir. 2019).  In the context of a preliminary injunction record reflecting that agents returned Ms. Doe to Mexico only after two interviews to assess whether doing so would be appropriate, *see* Doe Decl. ¶¶ 7-8, and with scant other

evidence of defendants' state of mind, Ms. Doe has not shown that officials willfully disregarded obvious risks of severe consequences and extreme danger in Ms. Doe's case.

## CONCLUSION

Defendants' motion to stay proceedings is granted in part and denied in part.  As to the claims that have not been stayed, plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

 _/s/  Rachel Kovner_____
RACHEL P. KOVNER
United States District Judge

Dated:          December 7, 2020
                Brooklyn, New York